# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                                 No. CR 18-3985 WJ

FRANK HOWE, JR.,

        Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

THIS MATTER comes before the Court upon Defendant's Motion to Dismiss For Lack of Subject Matter Jurisdiction, filed March 8, 2019 (**Doc. 29**), following an evidentiary hearing. Having reviewed the parties' pleadings and considered the applicable law, and having heard the testimony of witnesses and oral arguments of counsel, the Court finds that the United States has satisfied its burden of persuading this Court by a preponderance of the evidence that there is federal jurisdiction over this matter. Accordingly, Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction is DENIED.

## BACKGROUND

Defendant is charged with Aggravated Sexual Abuse, in violation of 18 U.S.C §§ 1153, 2241(a) and 2246(2)(A); Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C §§ 1153 and 113(a)(6); and Assault of an Intimate Partner by Strangulation, in violation of 18 U.S.C §§ 1153 and 113(a)(8). Each count in this matter is alleged to have occurred in Indian Country, and both Defendant and Victim Jane Doe are enrolled members of the Navajo Nation. The alleged

crimes involve a sexual assault inside and outside Defendant's vehicle, and the question here is whether this Court has jurisdiction over the case.

On May 7, 2018, Defendant was arrested after the Navajo Police came upon Defendant's Jeep vehicle that was heading south and had stopped near the intersection of Rock Springs Road and Highway 264 in Rock Springs, New Mexico in McKinley County. When law enforcement approached, Defendant was standing outside of the vehicle and Jane Doe was sitting on the ground. Both were on the right side (west side) of the vehicle. Ex. 1 (dash cam video, just past 35 min. mark); Exs. 11, 12 & 13.[1]

To identify the location of the crime, Navajo law enforcement reviewed reports, photographs, video, and visited the scene to take GPS coordinates for the "point of incident" where the alleged crimes occurred. Aware that the events occurred near the boundary line to land that is Indian country, criminal investigators plotted coordinates of the location of the alleged offenses five separate times with recreational GPS devices. Ex. 16. The coordinates (WGS84 GPS Coordinates as Latitude N 35° 37' 28.39', Longitude W 108° 49' 47.09") were provided to the Navajo Nation's Land Department, Division of Natural Resources, so that a land status determination could be made. It was first determined that the coordinates referred to a parcel of land in Rock Springs, New Mexico, with a legal description of Township 16 North, Range 19 West, Section 11, of the Southwest Quarter ("Section 11"). Section 11 is classified as Navajo Nation Fee Land, which means the Navajo Nation owns the land privately and that the Federal Government has no jurisdiction over this tract of land because it is not "Indian Country" as defined under 18 U.S.C.A. § 1151 Ex. 6.

---

[1] Exhibits refer to those admitted at the hearing. Government exhibits are numbered, and Defense exhibits are lettered.

A later Amended Field Verification was done on April 4, 2019 ("April 2019 survey") which superseded the earlier report and concluded that the land corresponding to the same GPS coordinates was in fact "Individual Indian Allotment" and therefore Indian Country. Doc. 34-1 (Govt's Ex. 1). The correct legal description of the land parcel was shown to be Township 16 North, Range 19 West, Section 10, of the Southeast Quarter ("Section 10"), which falls within Indian Allotment No. 1541, title to which is held by the United States in trust for individual Indians and is therefore considered "Indian Country." *See* 18 U.S.C. § 1151(c) ("all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."). Section 10 is immediately to the west of Section 11. For purposes of this case, there is no dispute that Section 10 is within land considered to be Indian Country while Section 11 is fee land owned outright by the Navajo Nation and thus, not land situated in Indian Country. Two main reasons were cited for the discrepancy between reports: (1) the April 2019 survey report used more sophisticated survey grade equipment rather than recreational GPS devices; and (2) the section corner marker that separated the east section from the west section had been missing at the time of the first report but was replaced by the time the April 2019 survey was done.

## DISCUSSION

Defendant does not dispute the coordinate numbers or that Section 10 is Indian Country but instead argues that the Government has not met its burden with respect to establishing that any of the alleged events occurred within Section 10 and in fact contends that all of the alleged offense conduct occurred in Section 11, which is not in Indian Country.

## I.  Legal Standard

The sole purpose of the hearing was to determine whether the court has jurisdiction over this case.

It is well established that "as a general matter, the trial court decides the jurisdictional status of a particular property or area and then leaves to the jury the factual determination of whether the alleged crime occurred at the site." *United States v. Antonio*, 2019 WL 4180406 (10th Cir. Sept. 4, 2019) (D.C. NO. 1:16-CR-01106-JMC-1) (D.N.M.) citing *United States v. Roberts*, 185 F.3d 1125, 1139 (10th Cir. 1999) ("the issue of what constitutes Indian Country is a matter for the judge and not the jury"); *see also States v. Levesque*, 681 F.2d 75, 78 (1st Cir. 1982) (holding that the question of land status is "a jurisdictional fact susceptible of determination without reference to any of the facts involved in determining defendants' guilt or innocence"). *See also* 10th Cir. Pattern Instr. 2.52, 2.53, 2.54 (2018) ("You are instructed that the alleged murder occurred within the [territorial] [special maritime] jurisdiction of the United States, if you find beyond a reasonable doubt that such offense occurred in the location described in the indictment"). In a criminal prosecution under 18 U.S.C. §§ 1152 or 1153, the Court determines its jurisdiction based on facts established by a preponderance of the evidence. *See United States v. Bustillos*, 41 F.3d 931, 933 (10th Cir. 1994) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). As a result, the Government has the burden of persuasion that this Court has jurisdiction over the case. *See McNutt,* 298 U.S. at 189.

The Government further contends that there is federal jurisdiction over this case if any part of the alleged offense occurred in Section 10, and that federal jurisdiction is absent only if *all* of the alleged events took place in Section 11, which is land owned by the Navajo Nation and is considered private land. The Government acknowledges that the jurisdictional and unique factual issues presented in this case appear to be of first impression for this district and the Tenth Circuit Court of Appeals, but the Government provides case precedent from other jurisdictions that have found that federal jurisdiction exists over criminal offenses that occur only partially within Indian

country or within the special maritime or territorial jurisdiction of the United States[2] all of which this Court considers to be persuasive authority. For example, in *Leonard v. United States*, the defendant attacked his rape victim on an air force base (federal jurisdiction), stabbed her with a screwdriver, forced her into an automobile and then drove off to a motel near the base (state jurisdiction) where the actual rape occurred. 500 F.2d 673 (5th Cir. 1974). The Fifth Circuit affirmed federal jurisdiction, finding that "the element of force employed by [the defendant] to achieve his purpose began on federal lands and continued to the consummation of the crime at a site off the Air Force Base." *Id.* at 674-75. The Fifth Circuit also affirmed federal jurisdiction in another case involving aliens who were charged with smuggling heroin in the United States, *Rivard v. United States*, where the conspiracy was formed outside of the country but several of the overt acts were committed in furtherance of the conspiracy within the United States by a co-conspirator. 375 F.2d 882 (5th Cir. 1967). The Seventh Circuit specifically addressed the issue of jurisdiction where any portion of a crime occurred in Indian Country. In *U.S. v. Torres,* the Seventh Circuit found that federal jurisdiction existed where a major portion of a conspiracy to "get rid of" the victim occurred in Indian country, even though the plan was initiated and the victim was actually abducted off Indian country land. 773 F.2d 449, 459-60 (7th Cir. 1984).[3]

The Government also refers to a Tenth Circuit case that did not concern Indian country jurisdiction, but is still relevant to the jurisdictional question. In *Swisher v.*

---

[2] A number of Title 18 sections specifically declare certain conduct to be a Federal crime if committed "within the special maritime and territorial jurisdiction of the United States." *See, e.g.,* murder, 18 U.S.C. § 1111. In some instances, the Assimilative Crimes Act, 18 U.S.C. § 13, is also applicable. *See also*, 15 U.S.C. § 1175; 15 U.S.C. § 1243; 16 U.S.C. § 3372.

[3] *See also United States v. Vicars*, 467 F.2d 452 (5th Cir. 1972) (even if all acts done by defendant in furtherance of the conspiracy were done in the Republic of Panama, the United States District Court for the Northern District of Texas did not lack jurisdiction over him); *United States v. Correa-Negron*, 462 F.2d 613 (5th Cir. 1972) (the fact that acts and conversations took place in Mexico did not make defendant any less guilty of encouraging and inducing illegal entry of aliens).

*Moseley*, the Tenth Circuit affirmed military court-martial (federal) jurisdiction to hear charges against a servicemen involving interstate transportation of a stolen vehicle even though crossing of the state line occurred off post. 442 F.2d 1331 (10th Cir. 1971). The court noted that in the federal civilian courts "an offense may be prosecuted in the district where it was begun, continued, or completed." *Id.* In the briefing in this case, Defendant offered no case authority holding that all of an alleged offense must occur within Indian country for federal jurisdiction to exist. At the hearing, defense counsel attempted to factually distinguish those cases by pointing out that in those cases, the entire bodies of the defendant and the victim were completely inside or outside Indian country, where in the instant case there may be only certain body parts which remained inside of Indian country. The Court is not persuaded by this argument, since the evidence presented at the hearing does not suggest that jurisdiction rides on such a narrow margin of error.

Therefore, federal jurisdiction will be found to exist if the preponderance of the evidence shows that all or some of the alleged offense took place in Section 10 which is Indian Country. A jury must still decide the question of whether the alleged crime(s) actually occurred within the site identified in the indictment.

## II.    Evidence and Testimony

Parties have stipulated that Section 10 is Indian country; that the boundary line between Section 10 and Section 11 is true and correct; and that the point of incident GPS coordinates (WGS84 GPS Coordinates as Latitude N 35° 37' 28.39', Longitude W 108° 49' 47.09) accurately indicate where the alleged offense occurred. However, Defendant maintains that the Government has not shown that any of the alleged events occurred within Section 10. The Government presented witnesses Samantha Yazzie and Alvernon Tsosie, who are both Navajo Nation Criminal

Investigators; and Calvin Wayne Murphy, Bureau of Indian Affairs ("BIA") Realty Specialist. Defense witnesses were Kyle Spolar, Surveyor and Karina Titus who is an Investigator for the Federal Public Defender. The Parties stipulated to the qualifications of their respective witnesses for purposes of the hearing on Defendant's Motion to Dismiss.

A.    Testimony by Navajo Criminal Investigators

Investigator Yazzie ("Yazzie") took GPS coordinates of the area where the car was parked, once on May 9, 2018—two days after the alleged incident—and again on August 17, 2018, both times on Garmin recreational devices.  Investigator Tsosie used a Magellan Explorist 500 to plot GPS coordinates for the same area on December 19, 2018.  Ex. 16.

Yazzie interviewed Defendant and Jane Doe separately. The victim stated in her interview that she was raped in Defendant's vehicle, that she was dragged from the car by force and that a scuffle had occurred on the ground.  Yazzie testified that Jane Doe's underclothes were found outside and west of the car. Yazzie referred to pictures taken of the crime scene area showing patches of ground disruption consistent with a scuffle having taken place next to where the car was located, Exs. 2, 3 and 4.  She also referred to photos showing Defendant and Jane Doe outside of and to the west the car, on Rock Springs Road.

Yazzie interviewed Defendant the day after the incident and noted abrasions on Defendant's shoulder and knee that appeared to her to be "fresh," although defense counsel disputes that assessment and contends that the scratches in the pictures appear to be starting to heal.  Exs. 32 & 33.  Defendant stated in this interview that he did have sexual relations with the victim, but such activity occurred previously and in another location.  He explained that the victim's underclothes were on the ground because they came off when he was trying to prevent her from leaving the car, and that they were both "rolling around" on the ground.

B.    Witness Calvin Murphy

Calvin Murphy ("Murphy") was dispatched by BIA to verify land status, using the GPS coordinates provided by the Navajo Criminal Investigators.  Initially, he was unable to locate the southwest corner of Section 11 (which is common to the southeast corner of Section 10). He discovered that the magnet section marker was missing, and had it restored. Murphy then used survey-grade GPS equipment to verify land status, relying on the following to plot the coordinates:

- pictures taken of the crime scene;

- aerial views of the location, including both north and south views;

- physical features in the area (e.g., drainage ditches, terrain breaks and pipes placed in the ground by BLM);

- section corner markers; and

- ground disturbance at the site the alleged assault took place next to where the car had been located, based on photos as well as statements by the criminal investigators who had been at the scene.

Exs. 21-29.  Using the above aids and points of reference, including photos taken at the crime scene showing the stopped Jeep vehicle with Defendant and Jane Doe outside the vehicle, Murphy was able to determine the boundary line between Section 10 and Section 11 which extended along the right side of the vehicle.  Murphy highlighted this line at the hearing so that it was more visible, and this line showed that the car was located inside of Section 11, but that both Defendant and Jane Doe were outside of and to the west of the vehicle, and clearly within Section 10.

C.    Defense Witnesses Kyle Spolar and Karina Titus

Defense presented Surveyor Kyle Spolar ("Spolar") and Karina Titus ("Titus") to rebut Murphy's testimony.  The essence of Spolar's testimony was that Murphy had no way to accurately pinpoint the location of the Jeep vehicle based on photographs because the programs and survey methods he used are not be capable of such accuracy.  He also claimed that one could not go back

to pinpoint a location with survey grade equipment that was previously plotted with recreational grade equipment because recreational grade equipment allowed for a range accuracy of 30 to 50 feet. Spolar concluded that at best, Murphy's determination of the Jeep vehicle's location could therefore be only an estimate that came within 30 to 50 feet of the vehicle's actual location and that the highlighted line Murphy drew on the photograph to indicate the placement of the vehicle near the boundary line between Sections 10 and 11 was not necessarily accurate for that reason.

Spolar visited the cleared crime scene with defense investigator Karina Titus ("Titus"), who provided Spolar with her approximation of where the vehicle was, based on photos she had seen, but she did not provide Spolar with any of these photographs. Titus also provided Spolar with width measurements of a Jeep, similar to the Jeep vehicle used by Defendant during the alleged crimes. Exs. F, G, H. Relying on this information, Spolar prepared a plat diagram from which he concluded that the boundary line between Section 10 and Section 11 fell further west of where Murphy's calculations had placed it, Ex. F ("Preliminary Plat") and so the vehicle could not have been as close to the Section 10 boundary line as Murphy concluded. Thus, according to Spolar, the plat diagram indicated that the Jeep vehicle, as well as Defendant and victim, fell in Section 11 at all times rather than in Section 10. Exs. F, G, H.

## III.    Whether Evidence Supports Existence of Federal Jurisdiction

In order to find that jurisdiction exists, the Court needs to determine only that all or a part of the alleged offense occurred in Section 10. The Court finds that in this case there is sufficient evidence supporting jurisdiction in this case.

Despite the presentation of competing testimony by Murphy (for the Government) and Spolar (for the Defense), this is not a case where both are equally weighted. Both individuals are undoubtedly qualified by their training and experience to offer testimony regarding land surveys,

but the Court was favorably impressed by the reliability of Murphy's methods and his thoroughness throughout the process of verifying land status. On the other hand, the Court noted serious defects in the basis for Spolar's opinion, which in turn raises considerable doubts about the reliability of his conclusions.

- The most egregious of these defects is that the starting point for Spolar's calculations was based solely on a re-estimation offered by Titus, an investigator for the Defense, regarding the location of the vehicle and the crime scene. At the hearing, Titus conceded that she was not qualified either by experience or training to pinpoint the location of the vehicle, yet Titus' estimation of where the vehicle was located at the time the alleged crimes occured is exactly what Spolar relied on to base his survey calculations. Spolar was asked whether, if he was given a picture of the Jeep vehicle on the road (for example, Ex. 13) he could plot the location of the vehicle and the location of the people next to the vehicle, to which Spolar responded that he had nothing in his "toolbox" to do that, and that his best calculations would be within 30 to 50 feet. Spolar criticized the methodology used by Murphy in trying to pinpoint the Jeep vehicle's location (using photographs, aerial views and physical land features)—yet Spolar's own starting point was based solely on Titus' estimation of where the Jeep vehicle was located at the time the Navajo Police encountered Defendant and victim. Spolar's conclusions refuting Murphy's testimony regarding the section boundaries are therefore questionable in terms of accuracy and reliability.[4]

- Spolar also disagreed with Murphy that a surveyor could go back with survey grade equipment to find the point where someone was standing that was previously plotted with recreational grade equipment. He opined that a reference point initially plotted with recreational grade equipment was accurate within a range of 30 to 50 feet, so that going back to pinpoint the location with survey grade equipment would not necessarily be

---

[4] District judges are assigned the role of gatekeeper to ensure that scientific testimony is both reliable and relevant. *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). The Court does not intend to carry out a full *Daubert* inquiry here in this decision regarding Murphy and Spolar as expert witnesses, but the Court has expressed to the parties its concern about juror confusion with expert testimony that is unreliable under *Daubert* and its intention that such evidence will not be permitted.

accurate.  However, Murphy testified that his initial reference point for the land status verification did not rely solely on the previous GPS coordinates (as suggested by Spolar); rather, he utilized several other points of reference, as listed above.

- Spolar never stated that Murphy's assessments were categorically wrong.  Spolar stated that he did not have enough information about the camera orientation and so he could not be sure about the trajectory of the boundary line.  *See* Ex. 13(b).  In other words, while Spolar's conclusion differed from Murphy's conclusion, Spolar did not offer anything specific to contradict the accuracy of Murphy's calculations.

Based on the evidence and testimony presented at the trial, the Court concludes that the preponderance of evidence supports federal jurisdiction in this matter.  The Court finds that Murphy's testimony, opinion and conclusions are reliable; in particular, Murphy's reference to photos showing the stopped Jeep vehicle is persuasive, since they graphically and clearly show the placement of Defendant and Jane Doe relative to both the Jeep vehicle and the section boundary.  *See, e.g.,* Exs. 13, 13(a) & 13(b).  This evidence, along with other evidence presented at the hearing,  supports the conclusion that at least part of the alleged assault occurred in Section 10, and this is a sufficient basis to find that this Court has jurisdiction over the case.

## IV.    Government's Proposed Jury Instruction

In its brief, the Government suggests that the Court instruct the jury at trial clarifying the Government's burden of proof in order to satisfy the jurisdictional element.  In this case, a jury might reasonably conclude that Jane Doe was assaulted, physically and sexually, while literally laying on the boundary line of Section 10 and Section 11. The Government is concerned that, without such an instruction, a jury might be confused or mistakenly come to the conclusion that the entire crime itself needs to take place completely within Indian country (that is, Section 10), in order to establish the jurisdictional element. The Government proposes the following instruction:

> "Third: the offense took place **within, in whole or in part**, Indian Country."
>
> "You are instructed  that the alleged offense occurred within the territorial jurisdiction of the United States, if you find beyond a reasonable doubt that such offense occurred within**, in whole or in part, Section 10,  that is, Indian Country**, the location described in the indictment."
>
> *See* generally 10th Cir. Pattern  Jury Instructions, 2.52, 2.53, 2.54 (2018) (emphasis added for modified language).

Defendant did not counter this instruction in any of the briefing.  The Court finds that a modified instruction regarding the jurisdictional element is necessary in this case under the particular circumstances in order to correctly set out the law and to prevent juror confusion.  Therefore, the Court grants the Government's request that a modified jury instruction on that element will be given to the jury. The Court approves of the suggested instruction, but will consider any non-substantive challenges to the instruction submitted by Defendant.

## V.      Concerns for Trial

In this opinion, the Court addressed the jurisdictional issue and has concluded that federal jurisdiction exists over this case because the alleged offense occurred partially or completely on a particular land area that is Indian allotment, which is considered "Indian country."  The Court bases its ruling largely on Murphy's opinion regarding the boundary line between Sections 10 and 11 relative to the GPS coordinates—in other words, the Court accepts the "map" of the section boundary as plotted and described by Murphy.

Under Tenth Circuit precedent, the jury is left with the factual determination of whether the alleged crime occurred at the site.  *Roberts*, 185 F.3d at 1139. As the Court advised counsel at the hearing, there is no reason to revisit or reargue the Court's jurisdictional ruling at trial in an attempt to move the boundary line further west, as doing so would distract the jury from the relevant issues. The Court held an evidentiary hearing for the sole purpose of determining whether

jurisdiction exists. Subjecting the jury to view plat diagrams and survey reports, as well as to hear testimony on the same, would serve no purpose except to potentially mislead and confuse the jury.

At the end of the hearing, the Court also expressed concern with potential *Daubert* issues and shared with counsel its initial impressions of the experts' opinions presented at the hearing, in the event either party decides to file a *Daubert* motion prior to trial.

## CONCLUSION

In sum, the Court finds and concludes that there is federal jurisdiction over this case, based on a preponderance of the evidence that the site of the alleged offense occurred within Indian Country.

Additionally, the Court grants the Government's request that a modified jury instruction on the jurisdictional element be given at trial. The Court approves of the Government's proposed instruction, but will consider any non-substantive challenges submitted by Defendant at a later time.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Dismiss For Lack of Subject Matter Jurisdiction (**Doc. 29**) is hereby DENIED, for reasons described in this Memorandum Opinion and Order.

_____
CHIEF UNITED STATES DISTRICT JUDGE